IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| DEPARTMENT OF EDUCATION, STATE OF HAWAII, | ) ) ) | CIVIL NO. 11-00047 JMS-BMK |

DEPARTMENT OF EDUCATION,　　　)　　CIVIL NO. 11-00047 JMS-BMK
STATE OF HAWAII,　　　　　　　　)
　　　　　　　　　　　　　　　　　)　　ORDER (1) AFFIRMING IN PART
　　　　　　　Plaintiff,　　　　　　)　　AND REMANDING IN PART THE
　　　　　　　　　　　　　　　　　)　　NOVEMBER 18, 2010 DECISION OF
　　　　vs.　　　　　　　　　　　　)　　ADMINISTRATIVE HEARINGS
　　　　　　　　　　　　　　　　　)　　OFFICER, AND (2) GRANTING IN
M.F., by and through her Parents R.F.　)　　PART AND DENYING IN PART
and W.F.,　　　　　　　　　　　　)　　DEFENDANT'S MOTION TO
　　　　　　　　　　　　　　　　　)　　SUPPLEMENT RECORD AND TO
　　　　　　　Defendant.　　　　　　)　　ENFORCE "STAY PUT"
_____)

**ORDER (1) AFFIRMING IN PART AND REMANDING IN PART THE NOVEMBER 18, 2010 DECISION OF ADMINISTRATIVE HEARINGS OFFICER, AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPLEMENT RECORD AND TO ENFORCE "STAY PUT"**

## I.  INTRODUCTION

This Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1400 *et seq*., action reviews November 18, 2010 Findings of Fact and Conclusions of Law (the "November 2010 Decision") of Administrative Hearings Officer Richard A. Young.  The November 2010 Decision addressed two consolidated requests for impartial hearing brought against Plaintiff State of Hawaii, Department of Education (the "State" or "DOE") by Defendant M.F., by and through her parents R.F. and W.F. (the "Student" or "M.F.").  The Hearings

Officer, incorporating a ruling he made in a prior August 26, 2010 Order, found denials of a right to a Free Appropriate Public Education ("FAPE"). He awarded (1) reimbursement for tuition and certain related services for private placement at the Loveland Academy ("Loveland") for the Student's School Year ("SY") 2009-2010 and 2010-2011, and for extended school years ("ESY") 2010 and 2011; and (2) compensatory education at Loveland for SY 2011-2012 to remedy a denial of FAPE from the beginning of the Student's SY 2008-2009 until February 11, 2010. He found, however, that the State's offer of FAPE for SY 2009-2010 was appropriate as to certain related services (occupational and physical therapy, and speech-language services).

Having primarily lost at the administrative level, the State filed this action pursuant to 20 U.S.C. § 1415(i)(2)(A), challenging particular findings of fact and conclusions of law encompassed in the November 2010 Decision. Doc. No. 1-1. The State denies that it failed to offer FAPE for the years in question, and, regardless, contends the Hearings Officer erred in the scope of the remedies awarded. In turn, the Student filed a corresponding Motion in this court seeking (1) to supplement the record, (2) partial summary judgment "to enforce" the November 2010 Decision, and (3) "to enforce Stay Put." Doc. No. 24.

Based on the following, the court (1) AFFIRMS the November 2010 Decision IN PART, and VACATES and REMANDS the action for further proceedings, and (2) GRANTS in part and DENIES in part the Student's corresponding Motion.

## II. BACKGROUND

A. **Factual Background**

1. *M.f. Qualifies for Services under the IDEA*

No one disputes that now-fourteen year old M.F. is disabled for purposes of the IDEA. Her parents adopted her from an orphanage in China when she was thirteen months old. AR 338, Nov. 2010 Dec. at 5.[1] She has multiple conditions qualifying her as "emotionally disturbed," including reactive attachment disorder, attention deficit hyperactivity disorder, gender identity disorder, and major depressive disorder. AR 337; MF082. Rather, at issue are procedural and substantive challenges to the offers, or lack of offers, of a FAPE by the DOE from 2008 to 2010.

---

[1] The record consists of several sets of documents. This Order uses the following abbreviations: "AR" refers to the Administrative Record (numbered from 1 to 354); "Pet." refers to Petitioner's Exhibits (numbered from 1 to 533), where "Petitioner" is M.F.; "Resp." refers to Respondent's Exhibits (labeled MF1 to MF103), where "Respondent" is the DOE; "Tr." refers to transcripts of hearings of August 24, 2010, September 21, 2010, September 22, 2010, and September 23, 2010; and "Doc. No." refers to the document number in this court's electronic case file.

The record indicates M.F. was receiving special education benefits since pre-school and at her DOE home school since at least 2006. AR 6; Pet. 210-37, 253-83. She had a "skills trainer" throughout her time at the home school, Tr. 206-07, and received special education services under an individualized education program ("IEP") for her SY 2007-2008. Pet. 198-209. Thus, near the end of her fourth grade year, the DOE had in place a May 28, 2008 IEP (the "May 2008 IEP"). Pet. 136-46. This offer of FAPE was to expire on August 29, 2008. Pet. 143; AR 336.

M.F.'s IEP team, including M.F.'s parents, met on May 29, 2008 to discuss the May 2008 IEP. M.F.'s parents did not object to that IEP, and they did not challenge it as an inadequate offer of FAPE -- the "written notice of department action" states that "the team proposed that the program and placement remain the same," and "[t]here were no concerns about program." The notice continues:

> Parents shared that [M.F.] will be attending Variety
> School for the summer. In the beginning of next school
> year [SY 2008-09], the team will meet to discuss any
> concerns regarding [M.F.] and her needs. It was
> suggested that a fade plan[2] be developed next school
> year.

_____

[2] A "fade plan" is apparently a plan to reduce dependence on support and intervention to establish student independence. *See, e.g.*, *Hazen v. S. Kingstown Sch. Dep't*, 2010 WL 5558912, at *2 n.2 (D.R.I. Nov. 22, 2010) (describing "fading out" to mean "systematically or gradually fade a support or an intervention" such "that the student becomes more independent").

AR 62. And so, after her fourth grade year, M.F. attended the private Variety

School for the 2008 summer. AR 62; Pet. 289; Tr. 210.

>    **2.    *Student Withdraws from Public School in Favor of Variety School for SY 2008-2009***

By all accounts, M.F.'s 2008 summer went well. On July 11, 2008,

M.F.'s mother called the DOE home school to notify it that M.F. would be

attending Variety School for the upcoming SY 2008-2009. The home school's

Student Services Coordinator ("SSC") wrote in an event log of July 11, 2008 that

"[M.F.'s] mother called and said that [M.F.] enjoyed attending Variety School

without the paraprofessional support and requested a release from [the home

school.]" AR 64. The SSC continued:

> [I] [t]old mother that I would inform the team and Hawaii
> Behavioral Health that [M.F.] will no longer need
> contracted services. Informed mother that if she would
> like [M.F.] to return to [home school] in the future, to
> contact the school. Called . . . Hawaii Behavioral Health
> . . . , submitted Cancellation Orders (for contracted
> services), and left voice messages for her BISS and
> Paraprofessional Support Service providers.

*Id.* Similarly, M.F.'s mother wrote in a July 9, 2008 email to a provider at Hawaii

Behavioral Health:

> Just wanted to let you know that [M.F.] will be attending
> Variety School next year [SY 2008-2009]. I know [home
> school] starts on 7/28 but Variety School will just be
> starting on their Summer Intersession (sic.). They will

start their new school year August 20. . . . I just wanted
to let you know in case they do not contact you until
school starts. [M.F.] continues to enjoy attending Variety
School. . . .
. . . .
The school has been quite a learning experience for
[M.F.] . . . . She is also happy that she can attend school
on her own; without a "helper". It is such a relief that
[M.F.] wants to attend Variety School during the regular
session. . . .

If we do not get a chance to talk again, I would like to
thank you once again for all your help. I will continue to
keep all your suggestions in mind.

Pet. 289.

Given M.F.'s move to Variety School, the May 2008 IEP expired on

August 29, 2008. Nevertheless, the DOE provided periodic notices to M.F.'s

parents indicating that M.F. was entitled to a FAPE and that if they wanted special

education services they should contact the DOE to enroll in a public school. The

DOE, however, did not prepare another IEP at the start of M.F.'s SY 2008-2009 or

SY 2009-2010, and did not review the May 2008 IEP in 2009.

Specifically, on July 31, 2008, the DOE provided by certified mail a

notice to M.F.'s parents, stating in part that:

Your child has been identified as a student with a
disability under the Individuals with Disabilities
Education Act (IDEA) and Chapter 56 of the Hawaii
Administrative Rules and is currently not enrolled in a
Hawaii public school. As a reminder to you, your child,

6

> as a student with a disability enrolled by you in a private school, is eligible for the following:
>
> __ X __ **Free Appropriate Public Education (FAPE)**
> Your child is eligible to receive a FAPE which includes special education and related services in the public schools.  If you wish to have your child receive these services by enrolling in a public school, please contact [the principal at home school] or [a district educational specialist].

AR 66.  The letter references a "Procedural Safeguards Notice for Parents and Students" as an attachment.  *Id.*  Although M.F.'s parents received the letter on August 4, 2008, they did not respond.  AR 68.

A similar letter was mailed to M.F.'s parents on November 3, 2008, stating in part:

> . . . .  As a parent of a student with a disability, you continue to have protection under the procedural safeguards of Chapter 56 (see attached "Procedural Safeguards Notice for Parents and Students").  Further, your child, as a student with a disability, is eligible for the following:
>
> __ X __ **Free Appropriate Public Education (FAPE)**
> Your child is eligible to receive a FAPE which includes special education and related services in the public schools.  If you wish to have your child receive these services in a public school, please contact the principal at the phone number listed above.
>
> __ X __ **Private School Participation Project (PSPP)**
> Our records indicate that your child has been identified by the HIDOE as having a disability, but is enrolled in a

> private school.  Your child may be eligible for services
> under the Private School Participation Project (PSPP);
> please see the attached description for details.  If you
> wish to pursue this option, please contact the principal at
> the phone number listed above.

AR 71.  The letter also references a "Procedural Safeguards Notice for Parents and Students" and a "Private School Participation Project Information" as attachments. *Id.*  Although M.F.'s parents received the letter on November 8, 2008, no response was received by the DOE.  AR 74.

The DOE mailed a similar letter to M.F.'s parents the following summer, by notice dated August 25, 2009.  In addition to referencing eligibility for a FAPE as before, this notice also referred to a "reevaluation" as follows:

> __X__ **Reevaluation**
> Our records indicate your child's three year re-evaluation
> is due.  The HIDOE proposes to conduct a re-evaluation
> of your child to determine continued eligibility for
> special education services because a review of existing
> evaluation data on your child indicates that the
> information we have is no longer current.  Should your
> child continue to be eligible for special education, an
> appropriate program for your child will be developed and
> placement will be determined.  If you wish to have a re-
> evaluation conducted, or if you need assistance in
> understanding the provisions of Chapter 56, please
> contact the principal at the phone number listed above.
>
> If we do not hear from you by, __September 25, 2009__;
>
> • a re-evaluation will **not** be conducted,

8

> • your child will **no longer** be eligible for special education, and
> • you will no longer receive this notice.
>
> Should you wish to request an initial evaluation for special education in the future, please contact your HIDOE home school.

AR 76. Like prior notices, this letter references a "Procedural Safeguards Notice" as an attachment. *Id.* As before, this letter was sent by certified mail to M.F.'s parents' address of record (the same address that was used the year before). AR 78. The notice, however, was returned as "unclaimed," with delivery apparently attempted on August 28, 2009, September 4, 2009, and September 14, 2009. AR 79.

On November 2, 2009, the DOE mailed another notice. This notice was similar to prior notices, except all three criteria (FAPE, "Private School Participation," and "Reevaluation") were marked. This notice provided that:

> If we do not hear from you by,   December 2, 2009   ;
>
> • a re-evaluation will **<u>not</u>** be conducted,
> • your child will **no longer** be eligible for special education, and
> • you will no longer receive this notice.
>
> Should you wish to request an initial evaluation for special education in the future, please contact your HIDOE home school.

AR 81.  This letter was sent to the same address as before, and was received on

November 3, 2009.  AR 83.  Unlike with prior notices, however, M.F.'s parents

responded to this notice.  Although their exact response is not in the record (the

court infers it was an oral response), M.F.'s parents apparently responded to the

DOE's latest notice by requesting services in some form or an updated evaluation.

Pet. 125.

On November 26, 2009, the DOE scheduled a conference for

December 10, 2009 (subsequently rescheduled to December 17, 2009) to

"determine what additional data, if any, is needed to define the needs of [M.F.]"

and "determine if a 504 or IDEA initial evaluation or reevaluation is warranted."

Pet. 128-29.  After that conference, various tests were scheduled and reports were

prepared as necessary for a new or revised IEP.  *E.g.*, Pet. 71-117; MF 070, 074,

076, 082, 086.  The DOE performed several new psychological and educational

evaluations in January 2010, and prepared a February 11, 2010 IEP ("the February

2010 IEP") for the remainder of SY 2009-10 and for part of SY 2010-11 (until

February 2011).  Pet. 33-47.  It offered, among other things, to place the Student at

an "Intensive Learning Center" ("ILC") with "integrated therapeutic supports" for

SY 2010-11.  Pet. 45-46.  The IEP provided that the Student "will not participate

with non-disabled peers," "will receive specialized instruction . . . in the special

education setting for the whole school day and will not participate in the general education setting," and "will receive specialized instruction in a public separate facility." Pet. 46. It also offered no speech or language services, and limited occupational/physical therapy (consultation one time per quarter, thirty minutes per semester). Pet. 45.

An IEP meeting was held on February 11, 2010. Pet. 31, 62. M.F.'s parents, however, disagreed with that offer of FAPE. Pet. 285-86. The parents disagreed with the DOE's proposed placement in an ILC at a middle school, and instead sought for M.F. to remain in her private school. (M.F. was now attending Loveland, having enrolled there in December of 2009, as explained below.)

On February 26, 2010, the DOE scheduled another IEP meeting for March 25, 2010. Pet. 284. That meeting apparently focused on ESY services for 2010. Pet. 13. The team considered additional reports from M.F.'s providers regarding the need for ESY in 2010. *See* Pet. 244, 245, 246. After the March 25, 2010 meeting, the DOE proposed that M.F. receive ESY services for the upcoming summer (the end of SY 2009-2010), but retained the proposed placement at the ILC. Pet. 13. M.F.'s parents again disagreed and, on April 6, 2010 filed their first Request for Impartial Due Process Hearing against the DOE. Pet. 8.

### 3.     *Private Placements at Variety School and Loveland Academy*

In rejecting the February 2010 IEP's offer of placement at an ILC, M.F.'s parents wanted M.F. to remain at her then-current private placement at Loveland, which she had begun attending in December 2009. M.F. had moved to Loveland during her sixth grade year (SY 2009-2010), after spending her prior year (SY 2008-2009) at Variety School -- where her fifth grade year had ended rather abruptly.

Despite M.F.'s enjoyable 2008 summer at Variety School, she began to develop a "gender identity issue" during her fifth grade year, although her father testified at the administrative hearing that she was doing fine academically. Tr. 211-12. At some point, she began dressing and acting like a male, and she stated she wanted to be a boy. AR 338. She changed her identity to "D." Variety School teachers and professionals accommodated M.F.'s preferences, and many reports refer to M.F. in the male gender and by M.F.'s taken name of "D." *See, e.g.*, AR 6 ("Although . . . the Student is biologically a girl, she insists on being referred to as 'he', he dresses and has the outward appearance of a boy. He has rejected the name [M.] and insists on the name of '[D.]'"); *see also* Tr. 211-12. There is some dispute as to whether she was exhibiting signs of this issue earlier, while at the DOE home school in her fourth grade year, when she "cut her hair short." AR 338;

Tr. 210-11. It was during her time at Variety School that M.F.'s parents had not responded to the DOE's notices, and had not requested any services from the DOE.

After about a year, M.F. was expelled from Variety School. Tr. 212. Apparently, M.F.'s disability-related issues caused problems with incidents of "inappropriate touching." As was explained at the administrative hearing, students were not sure if M.F. was a girl or a boy and "they wanted to verify" and there was "a touching incident where she touched one of the girls." Tr. 212. Her father explained that, after "increasing[] problems," Tr. 212, "[M.F.] was basically told, 'Pick up your things tomorrow and you're gone.'" Tr. 214. "[S]he loved Variety School, had developed a lot of friends, and so it was a pretty devastating thing for her." *Id.*

After Variety School expelled her, M.F. sought to attend the Academy of the Pacific ("AOP") beginning in September 2009. Tr. 214-15. After a two-week trial period, however, M.F. was not accepted because of "behavioral issues." Tr. 215-16. She apparently was not in school for much of the Fall of 2009 (the beginning of her SY 2009-10). Pet. 73. It was during this period (November 2009) that M.F.'s parents responded to the latest notice from the DOE. AR 81.

In December 2009, M.F. began a trial period at Loveland, Tr. 217; AR 7, and began attending Loveland full-time from January 2010. Tr. 218-22; Pet.

530, Ex. 45.[3]  She stayed at Loveland until late August 2011, when she was

accepted at AOP, where she currently attends.[4]

### 4.    *Administrative Proceedings*

M.F.'s April 6, 2010 Request for Impartial Due Process challenged

the substance of both the May 2008 IEP, and the February 2010 IEP.  AR 7-8 (case

number "DOE SY0910-124").  It focused on SY 2009-2010, seeking, among other

relief,

> [r]eimbursement to Petitioner and/or payment to the
> Loveland Academy for school tuition and related service
> expenses, including transportation, mental health
> services, speech and language services, and OT/PT
> services, at Loveland Academy for the 2009-10 school
> year, and extended school year 2010 [and] . . .
> [c]ompensatory education[.]

Pet. 8.

On July 27, 2010, M.F. filed a Motion for Partial Summary Judgment

with the hearings officer.  AR 27.  M.F. argued that it was undisputed that the DOE

---

[3] During M.F.'s enrollment at Loveland (at least until about September 2010), Loveland did not bill M.F.'s parents for its services.  Tr. 244.  When M.F.'s father was asked at the administrative hearing about Loveland's charges, he indicated that he had no discussions with Loveland about payment when the parents agreed to have M.F. attend Loveland, although he was aware that "it would be very expensive."  Tr. 245-46.  The record contains a billing statement from Loveland for services from December 2009 to September 9, 2010 totaling $167,143.96. Pet. 530, Ex. 45.

[4] M.F. is attending AOP at State expense, and with a skills trainer, as part of a "stay put" agreement resulting from the current litigation.  Doc. No. 36-7.

violated the IDEA because (1) the May 2008 IEP expired in August 2008, and thus the DOE failed to have an IEP in place at the beginning of SY 2009-2010 in violation of 20 U.S.C. §1414(d)(2)(A)[5] and (2) the May 2008 IEP was not reviewed annually, in violation of 20 U.S.C. § 1414(d)(4).[6] AR 31-32. The Motion sought summary judgment "on the issues of the [State's] failure to offer a Free Appropriate Public Education to [M.F.] for the school year 2009-10, and the failure to conduct an annual review of [M.F.'s] IEP." AR 33.

On July 30, 2010, M.F. filed a second Request for Due Process Hearing. AR 206 (case number "DOE SY1011-015"). This request focused on the February 2010 IEP -- which was also at issue in the April 6, 2010 request -- and challenged its offer of placement at an ILC for SY 2010-2011. AR 206, 210. It also asserted that M.F. "needs direct speech services to address her pragmatic

_____

[5] Section 1414(d)(2)(A) provides:

> At the beginning of each school year, each local educational agency, State educational agency, or other State agency, as the case may be, shall have in effect, for each child with a disability in the agency's jurisdiction, an individualized education program.

The Hearings Officer also cited Hawaii Administrative Rule ("HAR") § 8-56-31(a) (repealed Nov. 23, 2009), which provided that "[a]t the beginning of each school year the [DOE] shall have an IEP in effect, for each student with a disability within its jurisdiction." *See also* HAR § 8-60-47(a) (effective Nov. 23, 2009) ("At the beginning of each school year, the [DOE] shall have in effect, for each student with a disability within its jurisdiction, an IEP[.]").

[6] Section 1414(d)(4)(A)(i) requires the DOE to "ensure that . . . the IEP Team-- (i) reviews the child's IEP periodically, but not less frequently than annually, to determine whether the annual goals for the child are being achieved[.]"

language deficits and direct PT/[OT] services to address her deficits." AR 210.

Although this due process request partially duplicated the April 6, 2010 request,

this request asked for an additional remedy -- reimbursement and compensatory

education for the following year (SY 2010-2011 and ESY 2011). *Id.* The two due

process requests were consolidated on August 25, 2010. AR 222.

Meanwhile, on August 24, 2010, the Hearings Officer heard M.F.'s

Motion for Partial Summary Judgment. The hearing was limited to whether the

DOE violated the IDEA by failing to have an IEP in place before M.F.'s SY 2009-

2010 year and by not reviewing the May 2008 IEP annually. Tr. 8/24/2010 at 4.

In defense, the DOE argued that, once M.F. unilaterally withdrew from public

school, it no longer had any obligation to prepare an IEP. Because M.F.'s parents

did not respond to its notices of July 31, 2008, November 3, 2008, and August 25,

2009, the DOE contended that the parents no longer sought DOE special education

and related services. AR 56-57.

On August 26, 2010, the Hearings Officer granted M.F.'s Motion,

finding it undisputed that the DOE violated the IDEA on both grounds. AR 86. In

a three-page Order, the Hearings Officer simply ruled that the lack of responses

from M.F.'s parents "does not remove the DOE's obligations under HAR Section

8-56-31(a) and 20 U.S.C. Section 1414(d)(2)(A), and 20 U.S.C. Section

1414(d)(4)(A)."  AR 87.  Without further discussion, he thus concluded that

> the DOE *denied Student a FAPE* by failing to have an
> IEP in place for Student before the start of the 2009-2010
> school year.  Further the DOE *denied Student a FAPE* by
> failing to conduct an annual review of Student's IEP.

*Id.* (emphases added).  Because this ruling was made at a summary judgment stage,

no proceedings were conducted as to the circumstances and nature of M.F.'s

withdrawal from the DOE home school.

Following that ruling, a three-day hearing began on September 20,

2010 addressing the appropriate remedy for the denials of FAPE, and reviewing

the February 2010 IEP.  This proceeding incorporated the August 26, 2010 Order,

and thus began with M.F. having already established that the DOE had "denied

Student a FAPE" for SY 2009-2010 "by failing to have an IEP in place" and "by

failing to conduct an annual review" of the May 2008 IEP.  AR 192, 344.

Accordingly, the hearing focused on (1) the appropriateness of M.F.'s placement at

Loveland prior to the February 2010 IEP; (2) whether the February 2010 IEP

offered M.F. "an appropriate program" (*i.e.*, "speech and language services, and

direct [physical/occupational therapy] services to meet Student's needs");

(3) whether the February 2010 IEP's offer of placement at an ILC was appropriate;

and (4) whether Loveland is an appropriate placement after February 2010. AR 193, 345.

On November 18, 2010, the Hearings Officer issued his Findings of Fact and Conclusions of Law (the November 2010 Decision). AR 182-202; 334-354. The November 2010 Decision concluded that (1) Loveland was an appropriate placement for M.F. prior to February 11, 2010; (2) the February 2010 IEP offered an appropriate "program" (in terms of thirty minutes of physical and occupational therapy a semester, and with speech services provided in a regular classroom setting); but (3) the State's offer of placement at an ILC was inappropriate because it "did not meet [M.F.'s] needs for interaction with non-disabled peers and socialization opportunities"; and (4) Loveland was an appropriate then-current placement. AR 201-202, 353-354. As to the State's offer of FAPE, the Hearing Officer decided:

> Although the Hearings Officer concludes that Petitioners have not shown that the program in the February 11, 2010 IEP did not offer Student a FAPE, the Hearings Officer also concludes that Petitioners have shown that the DOE's offer of placement through the February 11, 2010 IEP in an ILC on a public school campus was not an appropriate placement for Student.

AR 201, 334. The Hearings Officer then made the following awards:

> As stated in the August 26, 2010 Order Granting [M.F.'s] Motion for Partial Summary Judgment, the DOE

18

denied Student a FAPE by failing to have an IEP in place
for [M.F.] before the start of the 2009-2010 school year.
Further, the DOE denied [M.F.] a FAPE by failing to
conduct an annual review of Student's IEP;

. . . .

. . . [B]ased upon the denials of FAPE, Petitioners
are awarded reimbursement for [M.F.'s] placement at the
current private placement, including school tuition, and
related services, including transportation, and mental
health services for the 2009-2010 and 2010-2011 school
years, and 2010 and 2011 ESYs.

. . . Petitioners' request for compensatory
education for the 2011-2012 school year is granted as
Student did not have a valid IEP from August 29, 2008 to
February 11, 2010[.]

AR 201-202, 353-54.

## B.     Procedural Background

On December 14, 2010, the State appealed the Hearings Officer's

November 2010 Decision to the First Circuit Court, State of Hawaii, under 20

U.S.C. § 1415(i).  M.F. then timely removed the action to this court.  Doc. No. 1-1.

The State filed its Opening Brief on April 15, 2011.  M.F. filed an Answering Brief

on June 15, 2011, and the State filed its Reply on June 30, 2011.

Meanwhile, on June 17, 2011, M.F. filed a Motion for Partial

Summary Judgment seeking, among other matters, "stay put" relief under 20

U.S.C. § 1415(j).  Doc. No. 14.  That Motion was deemed moot as the State was

not contesting whether it owed such relief, although there was (and still is) some

disagreement regarding the exact amounts owed.  On July 14, 2011, the State paid

Loveland $121,446.16, representing amounts it believed it owed from November

18, 2010 until that date, with certain reductions for therapy and speech services it

contends it is not obligated to pay (given the portions of the November 2010

Decision in the State's favor).  *See, e.g.*, Doc. No. 24-33, Defs.' Mot. Ex. BB.

Arguing that the amount was insufficient, on July 20, 2011, M.F. filed

a "Motion to Amend/Supplement Record on Appeal; Motion for Partial Summary

Judgment to Enforce 11/18/2010 HO Decision; and to Enforce 'Stay Put'" (the

"Stay Put Motion").  Doc. No. 24.  The State filed its Opposition to the Stay Put

Motion on August 15, 2011, and M.F. filed a Reply on August 22, 2011.

The court heard both matters (the substantive review of the November

2010 Decision, and the relief sought in the Stay Put Motion) on September 12,

2011.  On September 15, 2011, the court issued inclinations and requested

supplemental briefing from the parties, Doc. No. 40, and the parties submitted

corresponding memoranda.  *See* Doc. No. 41, 42.  Additional supplemental

memoranda were filed on November 17, 2011, and November 30, 2011.  *See* Doc.

Nos. 48-51.

///

///

# III.  STANDARD OF REVIEW

The IDEA provides that "[a]ny party aggrieved by the findings and decision" of the hearings officer "shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy."  20 U.S.C. § 1415(i)(2)(A).

The IDEA requires the following of the court:

In any action brought under this paragraph, the court --

(i) shall receive the records of the administrative proceedings;

(ii) shall hear additional evidence at the request of a party; and

(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(i)(2)(C).  In *Board of Education of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 206-07 (1982), the Supreme Court explained the court's role in reviewing an administrative decision in an IDEA case:

[T]he provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school

authorities which they review.  The very importance
which Congress has attached to compliance with certain
procedures in the preparation of an IEP would be
frustrated if a court were permitted simply to set state
decisions at nought.  The fact that § [1415(i)] requires
that the reviewing court "receive the records of the [state]
administrative proceedings" carries with it the implied
requirement that due weight shall be given to these
proceedings.  And we find nothing in the Act to suggest
that merely because Congress was rather sketchy in
establishing substantive requirements, as opposed to
procedural requirements for the preparation of an IEP, it
intended that reviewing courts should have a free hand to
impose substantive standards of review which cannot be
derived from the Act itself.  In short, the statutory
authorization to grant "such relief as the court determines
is appropriate" cannot be read without reference to the
obligations, largely procedural in nature, which are
imposed upon recipient States by Congress.

*See also City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 171 (1997)

(citing *Rowley* for the proposition that the IDEA "contemplates deferential review

of state administrative action").  The "fact-intensive nature" of IDEA proceedings

"coupled with considerations of judicial economy render a more deferential

approach appropriate."  *Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1104

n.4 (9th Cir. 2007).

The Ninth Circuit has explained that despite this deferential approach,

the court has discretion in reviewing the hearings officer's decision:

The proposition that the courts must give "due
weight" raises the question of how much weight is "due."

We held in *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987), that "[h]ow *much* deference to give state educational agencies . . . is a matter for the discretion of the courts." Following a First Circuit decision, we held in *Gregory K.* that the courts are to consider the findings "carefully and endeavor to respond to the hearing officer's resolution of each material issue," but the court "is free to accept or reject the findings in part or in whole." *Id.*

When exercising its discretion to determine what weight to give the hearing officer's findings, one criterion we have found useful is to examine the thoroughness of those findings. The amount of deference accorded the hearing officer's findings increases where they are "thorough and careful."

*Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995) (citations omitted; alterations in original); *see also Ms. S. ex rel. G. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1126 (9th Cir. 2003) ("The 'due weight' to be given is within the discretion of the appellate court." (*superseded on other grounds by* 20 U.S.C. § 1414(d)(1)(B))).

The burden in this proceeding is on the party challenging the administrative ruling. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005) ("The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief."); *Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1498 (9th Cir. 1996) ("As the party challenging the administrative ruling, the School District . . . had the burden of proof in district court.").

# IV. DISCUSSION

The court first details the applicable legal framework under the IDEA, and then addresses (1) whether the Hearings Officer erred in determining that M.F. was denied FAPE for any of the periods in question, and if so, (2) whether the Hearings Officer erred in determining that M.F. was entitled to reimbursement and compensatory education. Finally, the court considers the Stay Put Motion and addresses whether M.F. is entitled to "stay put" pending resolution of the State's challenges and, if so, to what extent.

## A. Legal Framework

A basic three-step analysis applies in determining whether a qualified disabled student is entitled to reimbursement for, or payment of, a private placement from the State under the IDEA.

First, the court asks whether the school district violated the IDEA, either "procedurally" or "substantively." *Rowley*, 458 U.S. at 206-07. A school district may violate the IDEA's statutory or regulatory procedures in creating or implementing (or failing to create or implement) an IEP. *Id.* Or a school district may violate the IDEA substantively by offering an IEP that is not reasonably calculated to enable the child to receive educational benefit. *Id.* The school district must provide the student with a FAPE that is "appropriately designed and

implemented so as to convey" to the student a "meaningful" benefit. *J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 433 (9th Cir. 2010) (quoting *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999)).

Second, if the IDEA's procedures are violated, the next question is whether that violation denied that student a FAPE -- for not all procedural violations are actionable. *See, e.g.*, *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 909 (9th Cir. 2009); 20 U.S.C. § 1415(f)(3)(E)(ii).[7] The procedural violation must result in the "loss of [an] educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process." *Id.* (quoting *W.G. v. Bd. of Trs. of Target Range Sch. Dist.*, 960 F.2d 1479, 1484 (9th Cir. 1992)). That is, "where a procedural violation does not result in a lost educational opportunity for the student, the violation is 'harmless error' because it does not deny the student a FAPE." *R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932,

---

[7] Section 1415(f)(3)(E)(ii) provides:

In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies--
    (I) impeded the child's right to a free appropriate public education;
    (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or
    (III) caused a deprivation of educational benefits.

938 n.4 (9th Cir. 2007) (quoting *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 651-52 (9th Cir. 2005) (Gould, J., concurring)).[8]

The third stage is the remedy -- and this stage itself includes several steps. If an IDEA violation results in denial of a FAPE, a district court has discretion to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). Such relief could include reimbursement for a private placement. *See* 20 U.S.C. § 1412(a)(10)(C)(ii); *Sch. Comm. of Burlington v. Dep't of Ed. of Mass.*, 471 U.S. 359, 370 (1985). It can also include compensatory education as "appropriate equitable relief." *Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1033 (9th Cir. 2006). The parent or guardian, however, must also establish that the particular private placement is itself "appropriate." *See, e.g.*, *Ashland Sch. Dist. v. Parents of Student E.H.*, 587 F.3d 1175, 1183 (9th Cir. 2009). That is, "where Parents seek reimbursement for private school expenses, they 'are entitled to reimbursement *only* if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act.'" *Id.* (quoting *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510

---

[8] *R.B. v. Napa Valley Unified School District*, 496 F.3d 932 (9th Cir. 2007), recognized that Judge Gould's concurrence is the "controlling opinion" of the three opinions in *M.L v. Federal Way School District*, 394 F.3d 634 (9th Cir. 2005). *See R.B.*, 496 F.3d at 938 n.4 ("As the narrower opinion joining in the judgment for the M.L. appellants, Judge Gould's concurrence is the 'controlling opinion[.]'") (citations omitted).

U.S. 7, 15 (1993)). "The latter requirement [(the appropriateness of private placement)] is essential to ensuring that reimbursement awards are granted only when such relief further the purposes of the [IDEA]." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, ----, 129 S. Ct. 2484, 2493 n.9 (2009).

Moreover, "even [if private placement is appropriate] courts [also] retain discretion to reduce the amount of a reimbursement award if the equities so warrant -- for instance, if the parents failed to give the school district adequate notice of their intent to enroll the child in private school." *Id.* at 2496; *see also* 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(aa) & (bb) (allowing reduction or denial if "the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency" or "10 business days . . . prior to the removal . . . the parents did not give written notice to the public agency").[9] "In considering the

---

[9] 20 U.S.C. § 1412(a)(10)(C) provides:

Payment for education of children enrolled in private schools without consent of or referral by the public agency

. . . .

(ii) Reimbursement for private school placement

If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free

(continued...)

equities, courts should generally presume that public-school officials are properly performing their obligations under IDEA." *Forest Grove*, 129 S. Ct. at 2496 (citation omitted). "The conduct of both parties must be reviewed to determine whether relief is appropriate." *Parents of Student W. v. Puyallup Sch. Dist., No. 3*, 31 F.3d 1489, 1496 (9th Cir. 1994) (internal citations omitted). Thus, "parents

---

[9](...continued)

appropriate public education available to the child in a timely manner prior to that enrollment.

(iii) Limitation on reimbursement

The cost of reimbursement described in clause (ii) may be reduced or denied--

(I) if--

(aa) *at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense*, or

(bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents *did not give written notice to the public agency* of the information described in item (aa) [emphases added];

. . . .; or

(III) upon a judicial finding of unreasonableness with respect to actions taken by the parents.

*See also* 34 C.F.R. § 300.148 (same).

who 'unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk[.]'" *Forest Grove*, 129 S. Ct. at 2496 (quoting *Carter*, 510 U.S. at 15). The court or hearings officer "must consider all relevant factors, including the notice provided by the parents and the school district's opportunities for evaluating the child, in determining whether reimbursement for some or all of the cost of the child's private education is warranted." *Id.*; *see also Forest Grove Sch. Dist. v. T.A.*, 638 F.3d 1234, 1239 (9th Cir. 2011) ("*Forest Grove III*") (interpreting § 1415(i)(2)(C)(iii) as "necessarily requir[ing] the district court to *weigh* the equitable factors" in determining both whether to award reimbursement and, if so, in what amount).

## B.  Application to the November 2010 Decision (Incorporating the Hearings Officer's August 26, 2010 Summary Judgment Order)

Applying these principles, the court finds that the Hearings Officer erred in deciding at a summary judgment stage that the State denied M.F. a FAPE (even given that the State committed procedural violations of the IDEA). He omitted the second step by not analyzing whether the procedural violations resulted in the "loss of an educational opportunity or seriously infringe[d] the parents' opportunity to participate in the IEP formation process." *L.M.*, 556 F.3d at 909.

He also erred at the third step by making awards of reimbursement and compensatory education without weighing necessary equitable factors.

### 1.     *Procedural Error*

It is undisputed that the State did not have an IEP for M.F. in place at the beginning of M.F.'s SY 2008-2009 or SY 2009-2010, and did not review the May 2008 IEP in 2009.  M.F. contends, and the Hearings Officer found, that the State thereby violated the IDEA, 20 U.S.C. §§ 1414(d)(2)(A) & 1414(d)(4).

The State, however, argues that M.F.'s unilateral withdrawal from public education in July 2008 excused it from preparing further IEPs until M.F.'s parents requested public services in December 2009.  The State makes a seemingly logical assertion:  The IDEA does not require parents to accept public special education services, and if parents unilaterally choose a private placement it makes little sense for the State to continue to go through the process of preparing an IEP as if a student is in a public placement.  And, in fact, the IDEA's statutory and regulatory scheme contemplates such a scenario in two ways.

First, by regulation, a public agency "[i]s not required to convene an IEP Team meeting or develop an IEP . . . for the child for further provision of special education and related services," 34 C.F.R. § 300.300(b)(4)(iv), "[i]f, at any time subsequent to the initial provision of special education and related services,

the parent of a child revokes consent in writing for the continued provision of special education and related services[.]" 34 C.F.R. § 300.300(b)(4).[10] This regulation essentially acts as a "safe harbor" provision. By its unambiguous terms, however, the revocation of consent must be "in writing" -- a condition absent here as the record demonstrates that M.F.'s parents made an *oral* request for "a release from [the home school.]" AR 64. Indeed, the U.S. Secretary of Education (through the Office of Special Education and Rehabilitative Services ("OSERS")) promulgated § 300.300(b)(4) with particular thought and attention given to the requirement that revocation be done in writing. *See* 73 Fed. Reg. 73006-01, 73008 (Dec. 1, 2008) ("We agree with the commenters that revocation of consent for

---

[10] 34 C.F.R. § 300.300(b)(4) provides:

> If, at any time subsequent to the initial provision of special education and related services, the parent of a child revokes consent in writing for the continued provision of special education and related services, the public agency--
>
> (i) May not continue to provide special education and related services to the child, but must provide prior written notice in accordance with § 300.503 before ceasing the provision of special education and related services;
> . . . .
> (iii) Will not be considered to be in violation of the requirement to make FAPE available to the child because of the failure to provide the child with further special education and related services; and
>
> (iv) Is not required to convene an IEP Team meeting or develop an IEP under §§ 300.320 and 300.324 for the child for further provision of special education and related services.

special education and related services must be in writing to ensure that both the

public agency and the parent have documentation that the child will no longer

receive special education and related services.").[11]

Second, the IDEA directly addresses at the remedial stage whether a

student can receive costs for a unilateral private placement, absent a challenge to

an offer of FAPE.  As noted above, the IDEA allows reduction or denial of the

costs of a unilateral placement if "the parents did not inform the IEP Team that

_____

[11]  Section 300.300(b)(4) became effective December 31, 2008, which is after M.F.'s July 2008 withdrawal.  *See* 73 Fed. Reg. at 73006.  Its provisions, however, are instructive in analyzing the IDEA's overall structure, as they demonstrate its overriding philosophy of parental participation with notice and informed consent.  Prior to 300.300(b)(4)'s promulgation, there was no specific regulation concerning unilateral withdrawal by parents (although such withdrawals were occurring).  During the rule-making process, "[m]any commenters opposed [allowing parents to unilaterally withdraw a student] . . . [and] stated that the decision to terminate services should by made by the IEP Team because the IEP Team includes both the parent and professionals."  73 Fed. Reg. at 73009.  Commenters contended that, since "children cannot by placed unilaterally into special education because eligibility for special education and related services is determined by a group of qualified individuals and the parent . . . if a parent believes special education services are not needed, the parent should consult with the IEP Team rather than making that determination unilaterally."  *Id.*  The Secretary of Education disagreed with that position, reasoning that the IDEA gives parents exclusive authority to consent (or not consent), and that "[a]llowing parents to revoke consent for the continued provision of special education and related services at any time is consistent with the IDEA's emphasis on the role of parents in protecting their child's rights and the Department [of Education's] goal of enhancing parent involvement and choice in their child's education."  *Id.*

Of particular importance, however, the Secretary of Education required the regulation "to specify that prior written notice consistent with [34 C.F.R.] § 300.503 be provided to parents before a public agency discontinues special education and related services to their child."  *Id.* at 73008.  Thus, even after receiving written notice of withdrawal, § 300.300(b)(4)(i) does not allow agencies to discontinue services without "prior written notice to the parent regarding the change in educational placement and services that will result from the revocation of consent." *Id.*  And so, even if a written withdrawal was not required when M.F. withdrew in July 2008 (as it would be currently), the current regulation is grounded in, and reflects, the fundamental IDEA principle of parental participation with informed consent that existed well before July 2008.

they were rejecting the placement proposed by the public agency," 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(aa), or "prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in [§] (aa)."  20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb); *see also* 34 C.F.R. § 300.148(c).

But the State has not cited, and the court has not found, a statutory or regulatory provision that specifically relieves a public agency of a duty to comply with the IEP provisions (§§ 1414(d)(2)(A) and 1414(d)(4)) where -- as here -- the student withdraws *orally*, and where the public agency does not then obtain confirmation in writing and assure that the parents are doing so in an informed manner.  Rather, the State simply re-asserts the general notion that parents must consent before accepting public services.  It cites 34 C.F.R. §§ 300.300(b)(1)[12] & 300.300(d)(4)(ii)[13] as indicating it no longer has an obligation to prepare an IEP if

_____

[12]  34 C.F.R. § 300.300(b)(1) provides:

(b) Parental consent for services.

(1) A public agency that is responsible for making FAPE available to a child with a disability must obtain informed consent from the parent of the child before the initial provision of special education and related services to the child.

[13]  34 C.F.R.§ 300.300(d)(4) provides:

(i) If a parent of a child who is home schooled or placed in a

(continued...)

a student's parents do not consent. Section 300.300(b)(1), however, applies to the "*initial* provision of special education and related services" and is thus not applicable. Similarly, § 300.300(d)(4)(ii) applies where a parent "does not provide consent for the initial evaluation or the reevaluation" -- a situation likewise not at issue here because the asserted violation was a failure to complete IEPs, not reevaluations.

While parents certainly are free to reject public services and choose a private placement, the IDEA's mandate centers on the concept that parents be given proper notice so that their consent (or withdrawal of consent) and corresponding educational decisions are *informed* ones. *See, e.g.*, *JG v. Douglas Cnty. Sch. Dist.*, 552 F.3d 786, 793 n.4 (9th Cir. 2008) (reasoning the IDEA's procedural requirements are "[t]o guarantee parents the ability to make informed decisions about their child's education"); *Amanda J.*, 267 F.3d at 891 (indicating the purpose of the IDEA's notice procedures is to assure parents are "fully

_____

[13](...continued)
  private school by the parents at their own expense does not provide
  consent for the initial evaluation or the reevaluation, or the parent
  fails to respond to a request to provide consent, the public agency
  may not use the consent override procedures (described in
  paragraphs (a)(3) and (c)(1) of this section); and

  (ii) The public agency is not required to consider the child as
  eligible for services under §§ 300.132 through 300.144.

34

inform[ed]"); *see also* 34 C.F.R. § 300.9(a) (defining "consent" to mean "[t]he parent has been fully informed of all information relevant to the activity for which consent is sought") & (b) (further defining "consent" to mean "[t]he parent understands and agrees in writing to the carrying out of the activity for which his or her consent is sought"). Fundamentally, the State has an obligation to "ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(B).

Notwithstanding the periodic notices sent months later, the State appears to have taken no affirmative steps (*e.g.*, written notices under 20 U.S.C. § 1415 and 34 C.F.R. § 300.503) when M.F. was orally withdrawn in July 2008 so as to confirm that her parents were informed of their rights at that important time. As noted above, before services are terminated, the IDEA's current regulations require prior written notice consistent with 34 C.F.R. § 300.503 to parents if a student withdraws *in writing* from a public placement, 34 C.F.R. § 300.300(b)(4)(i) -- and so certainly a revocation done orally would require no less. The fundamental IDEA principle of informed consent existed long before § 300.300(b)(4)(i) took effect. Thus, the State's logic (that -- automatically -- an IEP is not required whenever a student receiving special education services withdraws from public education) is flawed.

Because there is no authority excusing the State under these circumstances (verbal withdrawal with no written follow-up) from the clear direction in sections 1414(d)(2)(A) & 1414(d)(4) to prepare and review IEPs, the court agrees with the Hearings Officer that the State violated the IDEA by not at least attempting to prepare an IEP at the beginning of M.F.'s SY 2008-2009 and SY 2009-2010.[14]

---

[14] Some non-binding caselaw has held that a unilateral withdrawal of a disabled student from public school with no review proceedings pending (*i.e.*, without a parent having challenged an offer of FAPE) relieves a school district of the responsibility of further developing or revising an IEP annually. *See Amann v. Stow Sch. Sys.*, 982 F.2d 644, 651 & n.4 (1st Cir. 1992); *see also Carl D. v. Special Sch. Dist. of St. Louis Cnty.*, 21 F. Supp. 2d 1042, 1057 (E.D. Mo. 1998) (following *Amman*); *K.G. v. Sheehan*, 2010 WL 5644782, at *20-21 (D.R.I. Dec. 30, 2010) (same). The court will not apply *Amman* where -- as here -- the student's withdrawal was oral and where there is no indication that the withdrawal was done on an informed basis.

Likewise, the court has considered a ruling in *Moorestown Township Board of Education v. S.D.*, --- F. Supp. 2d ----, 2011 WL 4345433, at *8 (D. N.J. Sept. 15, 2011), indicating that a public agency need not have an IEP in place for a child who has unilaterally enrolled in private school and thus rejected a public offer of FAPE. *Moorestown* primarily addressed whether a student in a private placement must actually be "enrolled" in public school before a school district is required to evaluate the student, prepare an IEP, and offer FAPE. It ultimately answered the question "no," reasoning that the evaluation and IEP obligations derive from residence in the school district, not actual enrollment in a public school. 2011 WL 3434433, at *9. In so doing, it indicated that it was enough that a parent of a privately-enrolled student *requested* an evaluation, and thus requested an IEP -- and in that context observed that a school district need not otherwise annually evaluate a privately-enrolled student and develop a corresponding IEP. *Id.* at *12.

*Moorestown* looked to statutory and regulatory provisions requiring public agencies to have an IEP in effect at the beginning of a school year for each disabled child "in the agency's *jurisdiction,*" and thus stated that "[t]he statutory framework logically suggests that [a local educational agency] need not have in place an IEP for a child who has unilaterally enrolled in private school and thereby rejected the district's offer of a FAPE." *Id.* at *8. This particular reasoning implies (misleadingly) that an agency's "jurisdiction" refers to students receiving public services, either in public school or in an agency-placed private school (and not including unilaterally-placed private school students). Read in context, however, and considering

(continued...)

36

## 2. *"Loss of Educational Opportunity"*

Even given procedural violations, however, the Hearings Officer erred in summarily concluding that those violations necessarily denied M.F. a FAPE without first addressing whether those violations actually resulted in the "loss of an educational opportunity." *See, e.g.*, *L.M.*, 556 F.3d at 909; 20 U.S.C. § 1415(f)(3)(E)(ii). That is, the Hearings Officer omitted the relevant "harmless

---

[14](...continued)
regulatory commentary, it is apparent that "jurisdiction" refers to geography -- that is, it refers to a student's residence as the criteria for which local agency is responsible for IDEA compliance. *See, e.g.*, 71 Fed. Reg. 46540-01, 46593 (Aug. 14, 2006) (reasoning that "[34 C.F.R.] § 300.201 [which refers to "children with disabilities within its jurisdiction"] . . . clarifies that the district of residence is responsible for making FAPE available to the child.").

    *Moorestown* also relied, in part, on question-and-answer commentary to regulations promulgated under an older version of the IDEA, where the Office of Special Education and Rehabilitative Services ("OSERS") considered whether a public agency must evaluate a privately enrolled student annually to avoid potential reimbursement claims. 2011 WL 4345433 at *11-12. OSERS answered that under "[t]he new statutory provisions, incorporated in the regulations [20 U.S.C. § 1412(a)(10)(C)(iii)(I) and the current 34 C.F.R. § 300.148(c)]," a claim for reimbursement "must be made before a child is removed from a public agency placement." *Id.* at *12 n.12 (quoting 64 Fed. Reg. 12406-01, 12601 (Mar. 12, 1999)). Accordingly, "[i]t would not be necessary for a public agency to develop an IEP that assumes a public placement for each private school each year." *Id.* It also noted that "since [public agencies] must make FAPE available to all children with disabilities in their jurisdiction . . . public agencies must be prepared to develop an IEP and to provide FAPE to a private school child if the child's parents [actually] re-enroll the child in public school." *Id.* The OSERS commentary -- although it addressed a prior version of IDEA's regulations -- thus also indicates (as discussed below) that parents might not be entitled to private placement costs if they do not challenge an offer of FAPE before removing the child from a public school.

    Ultimately, however, even if *Moorestown* supports the State's position, its reasoning is not dispositive as to whether IEP requirements continue to apply where -- as here -- a student only withdraws orally and without written notice having been given by the State at that time. Indeed, *Moorestown*'s rulings make complete sense, but only if parents are fully informed. As with *Amman*, the court will not apply *Moorestown* here, where M.F.'s withdrawal was oral and where there is no indication that the withdrawal was done on an informed basis (such as in compliance with notice provisions in 20 U.S.C. § 1415 and 34 C.F.R. § 300.503).

error" inquiry, and simply found that denials of FAPE follow the absence of an IEP and its annual review.

Although an educational opportunity may certainly be lost if there is no IEP, M.F.'s parents appear not to have desired an IEP -- much less a public placement -- at all. M.F.'s parents did not respond to multiple notices from the DOE, and did not challenge the DOE's offer of a FAPE in May 2008 before choosing to enroll M.F. at Variety School in July/August 2008 and at Loveland in December 2009.

Although on the present record, it certainly appears that no educational opportunity was lost, the court recognizes that the record was not developed at the administrative level in this regard, especially as to whether M.F.'s parents would have accepted a public placement (*i.e.*, a "lost educational opportunity") during this period. *See, e.g.*, *MM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 535 (4th Cir. 2002) (reasoning that there was no evidence that student suffered an educational loss because her parents "would [not] have accepted any FAPE offered by the District"); *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 67-70 (3d Cir. 2010) (concluding there was no "loss of educational opportunity" in a situation where an IEP was not in place at the beginning of school year, due in part to lack of "cooperation" by parents); *Ashland*, 587 F.3d at

1185-86 (similar); *see also P.P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 738 (3d Cir. 2009) (adopting a hearings officer's reasoning, in denying compensatory education, that "there was no way [student] would have gone to public school until the 2005-2006 school year, and compensatory education should only have been awarded if the record showed that, if the evaluation had been timely, the parents would have transferred him to the District."). But if M.F.'s parents would not have accepted a public placement for SY 2008-2009 or SY 2009-2010, there would be no "loss of educational opportunity" from the failure to comply with §§ 1414(d)(2)(A) and 1414(d)(4) (*i.e.*, the failure to have an IEP in place for SY 2009-2010 or failure to review the May 2008 IEP annually).

Because the Hearings Officer's finding of denials of FAPE was made at the summary judgment stage, no hearing was conducted as to the circumstances and nature of M.F.'s withdrawal. No fact finding was done as to whether there was a loss of educational opportunity. No fact finding was done regarding the reasons M.F.'s parents apparently ignored the State's notices of July 31, 2008, November 3, 2008, and August 25, 2009. No fact finding addressed whether the parents' lack of responses constituted a "lack of cooperation." (Moreover, the Hearings Officer then awarded reimbursement and compensatory education without weighing any of these types of factors.) In short, remand is necessary for a proper and complete

determination of whether M.F. was denied a FAPE based on the procedural violations.

### 3. *Equitable Considerations*

The Hearings Officer also erred in awarding reimbursement and compensatory education for denials of FAPE without addressing 20 U.S.C. 1412(a)(10)(C)(iii), and its requirement to consider the parents' failure to challenge the May 2008 offer of FAPE and failure to provide written notice prior to withdrawal. Section 1412(a)(10)(C) was added to the IDEA in 1997 to "clar[ify] the circumstances in which parents who unilaterally remove their children from private school may receive tuition reimbursement." *Ms. M. v. Portland Sch. Comm.*, 360 F.3d 267, 271 (1st Cir. 2004) (citing Pub. L. No. 105-17, 111 Stat. 37 (1997)).

> The purpose of these "exceptions to reimbursement" provisions is to "giv[e] the school system an opportunity, before the child is removed, to assemble a team, evaluate the child, devise an appropriate plan, and determine whether a [FAPE] can be provided in the public schools." The 1997 IDEA amendments gave effect and more structure to case law preceding the amendments that held "that reimbursement for private school tuition depended on the parents cooperating with school authorities in determining the proper placement and educational plan for the child."

*Schoenbach v. Dist. of Columbia*, 309 F. Supp. 2d 71, 84 (D. D.C. 2004) (quoting

*Greenland Sch. Dist. v. Amy N.*, 358 F.3d 150, 159, 160 (1st Cir. 2004)); *see also*

*Ashland*, 587 F.3d at 1184 (permitting court to deny reimbursement because of

parents' failure to give school notice of objections to IEP); *Berger v. Medina City*

*Sch. Dist.*, 348 F.3d 513, 524 (6th Cir. 2003) (upholding decision to deny

reimbursement for failure to provide notice as required under

§ 1412(a)(10)(C)(iii)(I)(aa)).  Whether "the parents failed to give the school district

adequate notice of their intent to enroll the child in private school" is a key

equitable factor in deciding whether to award costs of a private placement.  *See*

*Forest Grove*, 129 S. Ct. at 2496 (explaining that the court "must consider all

relevant factors, including the notice provided by the parents and the school

district's opportunities for evaluating the child, in determining whether

reimbursement for some or all of the cost of the child's private education is

warranted").  The analysis requires a decision-maker "to *weigh* the equitable

factors."  *Forest Grove III*, 638 F.3d at 1239.  The Hearings Officer did none of

this in either his August 26, 2010 Summary Judgment Order, or his November

2010 Decision -- and proper weighing requires fact finding.[15]

---

[15]  M.F. is not seeking reimbursement for her SY 2008-2009 at Variety School -- reimbursement which would appear to be barred because she did not challenge the May 2008 offer of FAPE.  But the effect of not challenging the State's last offer of FAPE and unilaterally

(continued...)

**C**.     **Placement Determinations Before and After the February 2010 IEP**

Although the court remands for necessary fact finding, the court

nevertheless *upholds* the findings in the November 2010 Decision regarding the

State's offer of placement at an ILC, and M.F.'s corresponding unilateral

placement at Loveland.  That is, the court agrees with the Hearings Officer's

findings that (1) the State's February 11, 2010 offer of placement at an ILC was

inappropriate (a finding that the State did not challenge on appeal to this court, and

it is now deeded admitted by the State); and (2) M.F.'s corresponding placement at

Loveland was appropriate, both before and after February 11, 2010.

Having already established denials of FAPE in its August 26, 2010

Summary Judgment Order (a decision which the court has now vacated), the

Hearings Officer focused the November 2010 Decision on fact finding regarding

M.F.'s placement.  That is, the Hearings Officer was applying the relevant test for

determining whether to award costs of M.F.'s private education at Loveland -- a

_____

[15](...continued)
choosing private placement could also apply to her subsequent placement at Loveland, until a
review proceeding was pending.  *See, e.g.*, *Warren G. v. Cumberland Cnty. Sch. Dist.*, 190 F.3d
80, 84 (3d Cir. 1999) ("[W]hen parents unilaterally withdraw their children from public school,
absent mitigating circumstances, they are not entitled to reimbursement for private school tuition
until they request review proceedings.") (citing *Bernardsville Bd. of Educ. v. J.H.*, 42 F.3d 149,
156-58 & n.14 (3d Cir. 1994)); *Marissa F. v. The William Penn Sch. Dist.*, 2005 WL 2304738, at
*5 (E.D. Pa. Sept. 20, 2005) (barring plaintiffs from receiving reimbursement for any time
student was in private school before their request for due process).

student is entitled to an award of private school expenses "*only* if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act.'" *Florence Cnty.*, 510 U.S. at 15. The Hearings Officer addressed the appropriateness of both the State's offer of placement at an ILC and whether Loveland was an appropriate placement during relevant time frames: (1) December 2009 to February 11, 2010; (2) February 11, 2010 until the date of hearing (September 2010); and (3) September 2010 forward.

The evidence regarding the February 2010 IEP as summarized by the Hearings Officer was mixed. Ultimately, however, he determined that the State's offer of placement at an ILC was inappropriate because it was segregated. It offered the Student no opportunity to interact with peers. When it was offered, the ILC only had two other students, both male (one in sixth grade and one in seventh). It would have isolated Student. The goal was therapeutic so that Student could eventually return to a general education setting. AR 342, Nov. 2010 Decl. at 9, ¶ 32. Nevertheless, it did not meet her needs of "interaction with non-disabled peers and socialization opportunities." *Id*. at 18.

The State conceded at oral argument that it did not appeal the finding that its offer at an ILC was inappropriate. *See Warren G. v. Cumberland Cnty. Sch. Dist.*, 190 F.3d 80, 84 (3d Cir. 1999) (stating principle in an IDEA setting that

"[a]n issue is waived unless a party raises it in its opening brief"); *see also* *Blanchard v. Morton Sch. Dist.*, 509 F.3d 934, 938 (9th Cir. 2007) (reasoning that "[Student] abandoned that claim by failing to raise it in her brief on appeal"). Rather, the State argues that, while Loveland might have been an appropriate setting for M.F. initially, Loveland does not "continue[] to be an appropriate placement for the 2010-11 school year." Doc. No. 11, Pl.'s Opening Br. at 18. It contends Loveland does not offer interaction with non-disabled peers and "interaction with peers who can be role models," *id.*, or does not offer other opportunities for socialization.[16]

Giving credit to the Hearings Officer's assessment of the live testimony of experts and witnesses, the court upholds the thorough and careful findings that Loveland was an appropriate placement at all relevant times. *See, e.g., J.W.*, 626 F.3d at 439 ("[W]e look to the [IEP's] goals and goal achieving methods at the time the plan was implemented and ask whether these methods were reasonably calculated to confer [Student] with a meaningful benefit . . . . In

---

[16] Although not clear, to the extent the State is arguing that Loveland was inappropriate because it did not meet the IDEA's requirements, the argument fails. *See Florence Cnty. Sch. Dist. v. Carter*, 510 U.S. 7, 13 (1993) (holding that a private alternative placement need not meet the criteria of a FAPE); *Warren G.*, 190 F.3d at 84 (rejecting argument that private placement was inappropriate because it did not provide opportunities to interact with nondisabled students, commenting that "the test for the parents' private placement is that it is appropriate, and not that it is perfect").

striving for 'appropriateness,' an IEP must take into account what was, and what was not, objectively reasonable . . . at the time the IEP was drafted.") (quoting *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999)). The record contains ample evidence that M.F. improved markedly after enrolling at Loveland in December 2009 and through the early part of 2010. For example, her gender identity disorder has been overcome, her language usage is appropriate, and her anxiety issues are under control. *See, e.g.*, Tr. 165-66. And she was continuing to progress and benefit at the time of the hearing. The Loveland placement remained an appropriate placement at the time of the September 2010 hearing.

**D**.     **The Appropriate Remedy Given the Rulings to Vacate the November 2010 Decision in Part and Uphold it in Part**

The court thus vacates the November 2010 Decision in part (to the extent it incorporated the prior summary judgment rulings) and upholds it in part. With this mixed decision, the court explains the appropriate remedy as follows.

Because the court vacates the August 26, 2010 Summary Judgment Order and remands for a full analysis of whether procedural errors led to a denial of FAPE (and, if so, what remedy applies), the court necessarily must vacate (without reference to "stay put" relief) the portions of M.F.'s reimbursement and compensatory education awards that were based on that summary judgment decision. If M.F. was not denied FAPE there would be no predicate for

reimbursement of private placement at Loveland (at least until February 11, 2010, when the new IEP was offered), and no basis for the compensatory award for SY 2011-2012.[17]  The court thus vacates the award of compensatory education for SY 2011-2012, and the award of reimbursement for SY 2009-2010 (at least for the period up until February 11, 2010, when a new offer of FAPE was made).  It is difficult, however, to determine whether the Hearings Officer's reimbursement awards for the remainder of SY 2009-2010 and SY 2010-2011 (including awards for ESY) must also be vacated -- the court cannot tell (1) if the awards are linked solely to the prior procedural violations regarding the May 2008 IEP, or (2) if the awards are also based upon the improper ILC placement offered for M.F. in the February 2010 IEP.

Thus, an important dispute -- and one the court ultimately remands to the Hearings Officer for resolution -- is whether the November 2010 Decision meant to address and find that the February 2010 IEP was a denial of FAPE separate and divorced from those based solely on procedural violations.  The Hearings Officer's decision does not mention *Rowley*'s "meaningful benefit" standard in relationship to the February 2010 IEP.  Indeed, he appears to have

---

[17]  The compensatory award was clearly based solely on the procedural errors.  *See* AR 202, 354, Nov. 2010 Dec. at 21 ("Petitioner's request for compensatory education for the 2011-2012 school year is granted as Student did not have a valid IEP from August 29, 2008 to February 11, 2010.").

found that M.F. did *not* prove that the IEP's "program" was a denial of FAPE. AR

201, 353, Nov. 2010 Dec. at 20. But he did find that the proposed "placement" at

an ILC was not appropriate. As explained earlier -- from a full reading of the

November 2010 Decision -- it appears the Hearings Officer started the September

22, 2010 hearing with it already having been established that M.F. had been denied

FAPE. The Decision reads:

> In the August 26, 2010 Order . . . the Hearings
> Officer found that the DOE had denied Student a FAPE
> by failing to have an IEP in place for Student before the
> start of the 2009-2010 school year. Further, the DOE
> denied Student a FAPE by failing to conduct an annual
> review of Student's IEP.
>     In their requests, Petitioners allege other
> procedural and substantive violations of the [IDEA].
> Having decided that the DOE had denied Student a FAPE
> during the 2009-2010 school year, the main issues which
> remain in Petitioners' April 6, 2010 and July 30, 2010
> Requests are the following: [The appropriateness of the
> public placement offer and private placements].

AR 193, 344-45, Nov. 2010 Dec. at 11-12. But the Hearings Officer also based his

awards on a failure of the February 2010 IEP, in addressing M.F.'s claims for

relief, as follows:

> Based upon [the State's] failure to provide an
> appropriate program and placement for Student during
> the 2009-2010 school year and during 2010 ESY; and
> [the State's] failure to offer Student an appropriate
> placement through the February 11, 2010 IEP, Petitioners
> are awarded reimbursement for Student's placement at

47

> the current private placement, including school tuition,
> and related services, including transportation, and mental
> health services for the 2009-2010 and 2010-2011
> school[] years, and 2010 and 2011 ESY.
> . . . .
>     Finally, as it appears that Student was without an
> IEP from August 29, 2008 to February 11, 2010, [M.F.'s]
> request for compensatory education for the 2011-2012
> school year at the current private placement is awarded.

AR 201, 353, Nov. 2010 Dec. at 20.

It thus appears that the Hearings Officer made his awards in reliance

on *both* his summary judgment decision *and* his review of the February 2010 IEP.

If the Hearings Officer found the February 2010 IEP was a separate

denial of FAPE, then this court would have a basis to uphold the SY 2009-2010

reimbursement award (regardless of whether FAPE was denied at the beginning of

SY 2009-2010 for prior procedural violations) from February 11, 2010 until

February 10, 2011 (the date the February 2010 IEP offer would end, which would

be well into SY 2010-2011).  If, however, the Hearings Officer meant not to decide

whether the February 2010 IEP was a denial of FAPE by itself -- because he

believed that it was not necessary, given his earlier Summary Judgment Order --

then that basis for reimbursement awards for SY 2009-2010 and SY 2010-2011

would not exist.  Without resolving this question, it is not possible to apportion and

uphold an award stemming solely from the February 2010 IEP.  The November

2010 Decision is ambiguous in this regard, and the court deems it appropriate to remand the question to the Hearings Officer for clarification.

Upon remand, the Hearings Officer should also address other aspects of the remedy if he finds a loss of educational opportunity. As set forth above, a proper analysis must examine relevant equitable factors in deciding whether reimbursement should be restricted. See *Forest Grove*, 129 S. Ct. at 2496 (indicating a decision "must consider all relevant factors, including the notice provided by the parents and the school district's opportunities for evaluating the child, in determining whether reimbursement for some or all of the cost of the child's private education is warranted"); *Forest Grove III*, 638 F.3d at 1239 (requiring weighing of equitable factors in determining both whether to award reimbursement and, if so, in what amount).

The Hearings Officer must also weigh these equitable factors before making a *compensatory* award, where the award was based solely on procedural error. That is, a compensatory award should also take into account equitable factors, including whether a procedural error was prejudicial. *See, e.g.*, *P.P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 738 (3d Cir. 2009) ("[A] procedural violation alone cannot support a compensatory education award."); *Me. Sch. Admin. Dist. No. 35 v. Mr. R.*, 321 F.3d 9, 19 (1st Cir. 2003) ("Let us be perfectly

clear.  We recognize that compensatory education is not an appropriate remedy for

a purely procedural violation of the IDEA.  In contrast, a substantive violation may

give rise to a claim for compensatory relief.") (citations omitted).

Finally, on remand the Hearings Officer can also consider and

document the proper amount of reimbursement.  In the November 2010 Decision,

he awarded reimbursement for the costs of Loveland for SY 2010-2011, only three

months into the school year -- thus there was no evidence in the record as to

Loveland's charges from October 2010 through the end of SY 2010-11.  Pet. Ex. at

530.[18]  The only evidence in the original record is a billing summary that lists

monthly charges, totaling $167,143.96 for costs from December 9, 2009 to

September 9, 2010 (SY 2009-2010 and part of SY 2010-2011).  *See id.*  It is

unclear what services were included in those charges and why they differed from

month-to-month.  The State also argues that this amount is unreasonable and

excessive.  *See Florence Cnty.*, 510 U.S. at 16 ("Total reimbursement will not be

appropriate if the court determines that the cost of the private education was

unreasonable.").  The State contends that such amounts (approximately $20,000 a

month) should be documented as to how specific services were meeting M.F.'s

---

[18]  The record was supplemented in this proceeding, and now contains Loveland billing
statements through May 31, 2011.  *See* Doc. No. 24-2, Gurtiza Aff.; Doc. Nos. 24-3 to 24-22,
Pet. Exs. A to R.

specific needs.  It points out that the Hearings Officer upheld its offer of FAPE as

to the limited occupational and physical therapy and individual speech services.  If

Loveland's fees included those services, they should not be part of the award (if it

is possible to segregate them).  Those arguments may be considered by the

Hearings Officer on remand.[19]

The court thus remands for the Hearings Officer to consider the

remedy for *all* aspects of the action (with "stay put" relief being considered

separately, as analyzed below).

## E.    The Stay Put Motion

The court next addresses M.F.'s July 20, 2011 Stay Put Motion.  Doc.

No. 24.

### 1.    *Additional Evidence*

The Stay Put Motion first seeks under 20 U.S.C. § 1415(i)(2)(C)(ii)

to supplement the record to add evidence regarding (1) the nature and costs of

Loveland's services (additional billing statements, and Affidavits of Maurolyn

Guritza and Patricia Dukes), Doc. Nos. 24-3 to 24-22, and (2) correspondence

_____

[19]  Even if M.F.'s parents had not actually paid Loveland, the court rejects the State's argument that a student must actually expend costs before they can be "reimbursed."  The IDEA grants courts broad power to "grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C)(iii).  "Reimbursement," if otherwise appropriate, can be awarded retroactively as payment for tuition that is due.  *See, e.g.*, *Mr. & Mrs. A. v. N.Y.C. Dep't of Educ.*, 769 F. Supp. 2d 403, 427-28 (S.D.N.Y. 2011).

between the parties regarding payment of "stay put" during these proceedings.

Doc. Nos. 24-23 to 24-35. As discussed at the hearing in this matter, the State does

not object to supplementation (and a party plainly has a right to submit relevant

additional evidence in these proceedings). The court thus GRANTS the portion of

the Stay Put Motion seeking additional evidence be made part of the record.[20]

## 2. *Partial Summary Judgment to Enforce November 2010 Decision*

The Stay Put Motion also seeks partial summary judgment on the

State's liability for reimbursement beginning from February 11, 2010 forward

because the State did not appeal the finding that its proposed placement at an ILC

was inappropriate. This aspect of the Motion essentially duplicates part of the

administrative review proceeding. As analyzed above, it is ambiguous whether the

Hearings Officer's reimbursement award for SY 2010-2011 was based solely on

the February 2010 IEP's inappropriate offer of placement (or whether that finding

was meant to be a finding of denial of FAPE). That is, it is unclear whether the SY

2010-2011 reimbursement award was based in part on the prior denials of FAPE

(which the court is remanding). Because the court is remanding for the Hearings

Officer to clarify the intent of his November 2010 Decision, it is premature to enter

_____

[20] Similarly, the parties agreed at the hearing that the record is supplemented by the State with an August 8, 2011 Declaration of Marcy Kagami (and corresponding Exhibits A to J), regarding "stay put" payments made or withheld by the State. *See* Doc. Nos. 36-1 to 36-11.

summary judgment in favor of M.F. on this issue.  At present, disputed issues of material fact remain.

### 3.     *"Stay Put" Relief*

The third request in the Stay Put Motion seeks relief under 20 U.S.C. § 1415(j), primarily in the form of payment to Loveland for M.F.'s past placement from December 2009 through August 2011.

Section 1415(j) provides, in pertinent part:

> [D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

The Ninth Circuit has interpreted this provision as making "the school district and the state responsible for the costs of [a student's] placement during the court review proceedings regardless of which party prevails in this appeal." *Clovis Unified Sch. Dist. v. Cal. Office of Admin. Hearings*, 903 F.2d 635, 641 (9th Cir. 1990).  "[O]nce the [Hearings Officer] decided that the parents' [private] placement was the appropriate placement, it became the 'then current educational placement' within the meaning of section [1415(j)]." *Id.* (citing *Sch. Comm. of Burlington*, 471 U.S. at 372-73).  A school district's "consent to the private

placement is implied by law." *L.M.*, 556 F.3d at 912 (quoting *Mackey v. Bd. of Educ. for Arlington Cent.*, 386 F.3d 158, 163 (2d Cir. 2004)). At that point, under § 1415(j), "the school district is responsible for appropriate private education costs regardless of the outcome of an appeal." *Id.* (citing *Clovis*, 903 F.2d at 641). A contrary reading "would force parents to leave a child in what they feel may be an inappropriate educational placement, or act at their peril in keeping a child in their chosen placement, after a successful administrative ruling." *Clovis*, 903 F.2d at 641 (citing *Sch. Comm. of Burlington*, 471 U.S. at 372-73). In short, a ruling in favor of a student's private placement transforms a placement from unilateral to "bilateral." *See*, *e.g.*, *D.C. v. Dep't of Educ.*, 550 F. Supp. 2d 1238, 1249 (D. Haw. 2008) ("[A] favorable administrative ruling constituted the State's agreement to the private placement, thus transforming a once-unilateral private placement into the child's 'then-current educational placement' for the purposes of the stay-put provision.").

The State agrees that it may not change M.F.'s placement during these and other review proceedings (absent consent). It admits that, because M.F. prevailed at the administrative level, it is responsible for expenses for a private

placement during the stay put period while it pursues review.[21]  The dispute,

however, is over (1) when the stay put period began, and (2) what amounts it

covers.  The answers to those questions will determine how much must the State

must pay, or should have paid, to Loveland as stay put.  The court turns to those

questions.

> a.  *"Stay Put" began when M.F.'s placement became bilateral on November 18, 2010*

M.F. argues that the State "agreed" to placement at Loveland as of

either December 2009 (when M.F. enrolled at Loveland) or February 2010 (when

the State offered an inappropriate placement at an ILC).  That is, M.F. asserts that

the State's concession in this proceeding should be construed as a bilateral

"agreement" that M.F.'s "then-current educational placement" under § 1415(j) was

Loveland effective in December 2009 or February 2010.  M.F. thus contends that

Loveland became her stay put placement as early as December 2009, such that the

State must pay as stay put relief Loveland's tuition incurred from one of those

dates until August 2011 when she enrolled by consent at AOP.  The court

disagrees.

---

[21] As noted earlier, M.F. is presently attending AOP at State expense as an agreed stay put placement.

When M.F. withdrew from public school in July 2008, in favor of Variety School, she did so "unilaterally." Her parents did not challenge the May 2008 IEP as a denial of FAPE. Likewise, when she began at Loveland in December 2009, it too constituted a unilateral placement. Later, after requesting services, the State made an offer of FAPE in its February 2010 IEP, which M.F. then challenged. Meanwhile, she remained at Loveland in her unilateral placement. It was not until the November 2010 Decision that the Hearings Officer determined that the February 2010 IEP offered an inappropriate placement, and that private placement at Loveland was appropriate. At that point, placement at Loveland became "bilateral" -- it became the "then current educational placement" within the meaning of § 1415(j). *See Clovis Unified Sch. Dist.*, 903 F.2d at 641; *D.C.*, 550 F. Supp. 2d at 1248-49.

The court finds no basis for deeming the stay put period to have begun earlier. Under M.F.'s theory, the State "agreed" that placement at Loveland was appropriate in December 2009 or February 2010 when it chose not to challenge those findings of the Hearings Officer (and chose not to challenge the finding that its offered placement at an ILC was inappropriate). But even if such a concession could constitute the necessary "consent" to the private placement, the State only "agreed" when it chose not to appeal those particular findings -- which occurred at

the earliest on December 14, 2010 when it filed its appeal to the First Circuit Court, State of Hawaii.  *See* Doc. No. 1-1, Notice of Admin. Appeal at 6.  Its "agreement" could also have occurred when its opening brief failed to raise the issues.  Either way, the "agreement" was *after* the November 2010 Decision, when the placement at Loveland had became bilateral.[22]

Therefore, M.F.'s stay put period at Loveland began on November 18, 2010, when the Hearings Officer ruled in favor of M.F.  Section 1415(j) applies from that date "until any placement dispute between the agency and the child's parents is resolved."  *Makiko D. v. Hawaii*, 2007 WL 1153811, at *9 (D. Haw. Apr. 17, 2011) (quoting *Johnson v. Special Educ. Hearing Office*, 287 F.3d 1176, 1179 (9th Cir. 2002)).[23]

///

///

///

---

[22] Furthermore, "the stay put provision does not apply unless and until a request for a due process hearing is filed."  *K.D. v. Hawaii Dep't of Educ.*, 2011 WL 6760338, at *4 (9th Cir. Dec. 27, 2011).  "The stay put provision may only be invoked 'during the pendency of any proceedings.'"  *Id.* (quoting 20 U.S.C. § 1415(j)).  M.F.'s first request for due process hearing was not filed until April 6, 2010, which is thus the earliest date stay put could begin.  Even if the State's concession could be construed as an "agreement," the stay put period could not have begun in December 2009 or February 2010 as M.F. argues.

[23] Whether M.F. is entitled to *reimbursement* for tuition and related expenses at Loveland from December 2009 until November 18, 2010 (or even later) for a denial of FAPE is a separate question from whether such expenses must be paid as stay put relief.

b.     *"Stay Put" consists of services in the November 2010 Decision,*
       *but remand is necessary to determine the scope of relief*

The remaining question is whether Loveland's expenses should or can

be reduced to reflect those aspects of the Hearings Officer's decision in favor of

the DOE regarding occupational/physical therapy and speech services.[24]  M.F.

contends that, even if stay put applies only from November 18, 2010 until August

2011, the State is responsible for the full costs of placement at Loveland from

November 18, 2010 as stay put.  The State, however, wants to reduce the amount.

It points to the Hearings Officer's findings that M.F. did not need direct

speech/language or occupational/physical therapy services, and contends that it

should not have to pay Loveland for those particular services.  In this regard, the

State asked Loveland in May 2011 for information about how Loveland's services

for speech/language and occupational/physical therapy are billed, so as effectively

to "pro-rate" Loveland's billing statement.  *See* Doc. No. 37-4, Gurtiza Decl. Ex.

FF.  Loveland responded by informing the State that "speech and [occupational

therapy] services are included in the day treatment and BPSR [bio-psycho social

rehabilitation] services" and that generally, "these services are provided directly or

---

[24]  After this action was filed, the State prepared a new IEP dated February 10, 2011 IEP.
*See* Doc. No. 36-6, Kagami Decl. Ex. E.  Any issues with this new IEP are not before the court.
The court only has jurisdiction to review stay put issues as to challenges encompassed in the
Hearings Officer's November 2010 Decision.

in group according to the IEP." Doc. No. 37-3, Gurtiza Decl. ¶ 6. Loveland

submitted billings to the State for "services actually provided to [M.F.], as she was

a full day treatment student in [Loveland's] full day treatment program[]." *Id.*

¶ 10.

Loveland's Executive Director, Patricia Dukes, explains that services

to M.F. were delivered "through a fully integrated, inter and intra dependent, trans-

disciplinary team approach." Doc. No. 24-3, Dukes Aff. ¶ 5. Dukes reviewed

M.F.'s particular billings, and attests that any separately billed charges "do not

include any charges for group or individual speech language occupational therapy

and/or physical therapy." *Id.* ¶ 8. Thus, M.F.'s argument appears to be either (1)

Loveland cannot segregate charges for individual speech language and

occupational/physical therapy (as any such services are integrated into their day

treatment program), or (2) Loveland provided no such services to M.F. at all.

On July 11, 2011, the State paid Loveland $121,446.16, representing

its stay put payment for Loveland's services from November 18, 2010 until May

31, 2011.[25] The State, however, deducted approximately $12,500 from Loveland's

billings, representing pro-rated charges for therapy and speech services it believes

---

[25] At the September 12, 2011 hearing, the State indicated it has since made an additional
payment, presumably for charges after May 31, 2011.

it should not have to pay.  Doc. Nos. 36-8 to 36-10, Kagami Decl. Exs. G, H, & I;

Doc. No. 24-33, Defs.' Mot. Ex. BB.  The Stay Put Motion thus seeks a ruling that

the State improperly deducted these amounts from Loveland's charges, and that the

State is not authorized to pro-rate charges for the remaining period at issue (June 1,

2011 to August 12, 2011).

As analyzed above, the November 2010 Decision is now the bilateral,

current, educational placement.  The prior placement at Loveland, including the

services provided in that placement, was unilateral.  And the bilateral placement --

and the particulars of it as found to be proper by the Hearings Officer -- cannot be

changed without consent under § 1415(j).  *See Susquenita Sch. Dist. v. Raelee S.*,

96 F.3d 78, 86 n.9 (3rd Cir. 1996) ("The 'new' ["stay-put"] placement created here

by agreement is, by the terms of the agreement -- *i.e.*, the appeals panel decision, --

effective "unless [the decision] is overturned in a Commonwealth or federal district

court."); *see also K.D. v. Hawaii Dep't of Educ.*, 2011 WL 6760338, at *5 (D.

Haw. Dec. 27, 2011) ("Where a parent unilaterally changes the placement of a

child, but a subsequent administrative or judicial decision confirms that the

parental placement is appropriate, *the decision* 'constitute[s] an agreement by the

State to the change of placement' and the placement becomes the 'current

educational placement' for the purposes of the stay put provision.") (citations

omitted) (emphasis added). Thus, the State's position (that it should not be required to pay for services that were unilateral before the November 2010 Decision) has some validity.

The matter, however, is not as simple as the State has argued. If M.F. did not actually receive any services that the Hearings Officer found were not required, then the State should not have reduced Loveland's billings. Further, if the nature of Loveland's program is truly such that it is impossible to segregate costs for any speech/language and occupational/physical therapy services that it might have provided to M.F., then as an *equitable* matter it appears improper for the State to deduct amounts it estimated (on its own) for such services.[26]

"Stay put" relief need not duplicate exactly what was previously in place. *See, e.g.*, *Johnson*, 287 F.3d at 1181 (reasoning that school district "can meet the requirements of the 'stay put' provision by providing comparable educational placement"); *Makiko D.*, 2007 WL 1153811, at *10 (citing numerous

---

[26] *See, e.g.*, *St. Tammany Parish Sch. Bd. v. Louisiana*, 142 F.3d 776, 783 (5th Cir. 1998) ("Reimbursement to parents for private school tuition (whether retroactive *or pending a merits-decision*) is an equitable remedy, which may be imposed in the discretion of the district court.") (emphasis added); *id.* at 788 ("In any event, at some point in these proceedings, the State defendants must be given a meaningful opportunity to challenge both the nature and the reasonableness of the [interim] costs. The timing of such an opportunity is, of course, a matter to be determined by the district court, in the exercise of its sound discretion."). Although *Joshua A. v. Rocklin Unified School District*, 559 F.3d 1036, 1040 (9th Cir. 2009), indicated that the stay put provision requires "no balancing of equities," this does not mean the court does not have discretion as a matter of "equity" to require the State to provide -- as stay put relief -- some limited services that might otherwise not be required in an IEP.

cases indicating that "a stay-put placement must be comparable to [the student's] placement under the [hearings officer's] Order and must approximate his old IEP (as implemented by the [hearings officer's] Order) as closely as possible").  An obvious inequity would result if "unapproved" services truly cannot be segregated from the *required* services.  Depending upon the circumstance, it could be inequitable to require a student to incur financial responsibility for a significant amount of "unapproved" services as a condition to receiving the required and approved services.

Here, for example, if Loveland's services are not subject to being segregated, Loveland could still hold M.F.'s parents responsible for amounts not paid by the State (*i.e.*, approximately $12,500) for services that the parents had no ability (especially in hindsight) to decline as part of the "stay put" placement at Loveland.  The court can easily envision scenarios where parents and a disabled student would be put in an untenable situation of having to decide whether to continue at a bilateral placement (and still incur significant and potentially prohibitive expenses -- such as the $12,500 at issue here -- for extra services), or to accept an inappropriate public placement, but at no cost.  This would be contrary to the purpose of the IDEA.  *See, e.g.*, *Clovis*, 903 F.2d at 641 (recognizing that the Supreme Court "refused to give the stay put provisions a reading that would force

parents to . . . act at their peril in keeping a child in their chosen placement, after a successful administrative ruling").

Ultimately, however, making this decision requires further fact-finding. It is unclear whether M.F. actually received services that the Hearings Officer found were not necessary. It is also unclear whether the nature of Loveland's program is such that it is not possible to segregate payment for individual occupational/physical therapy and speech/language services from its otherwise integrated program. These are questions that State Hearings Officers (who have particular familiarity with Loveland's programs and practices) can address at an evidentiary hearing, and that the Hearings Officer here can consider along with other matters that the court is remanding. *See, e.g.*, *Makiko D.*, 2007 WL 1153811, at *10 (remanding factual issue regarding placement to determine appropriate stay put relief).

## V. <u>CONCLUSION</u>

Based on the above, the court AFFIRMS in Part and REMANDS in Part the Hearings Officer's November 18, 2010 Decision.

The court also GRANTS in part and DENIES in part Defendant's Stay Put Motion, Doc. No. 24, and REMANDS for further findings relevant to "stay put" relief.

The Clerk of Court shall close this case. If, after the Hearings Officer issues a new decision, either party subsequently appeals under 20 U.S.C. § 1415(i)(2)(A), the court shall waive the filing fee and the matter will be assigned to this court under Local Rule 40.2.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, December 28, 2011.



/s/ J. Michael Seabright
_____
J. Michael Seabright
United States District Judge

*Dept. of Educ, State of Hawaii v. M.F.*, Civ. No. 11-00047 JMS-BMK, Order (1) Affirming in Part and Remanding in Part the November 18, 2010 Decision of Administrative Hearings Officer, and (2) Granting in Part and Denying in Part Defendant's Motion to Supplement Record and to Enforce "Stay Put"